**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AKHIL GUPTA, derivatively on behalf of SONIM TECHNOLOGIES, INC., | |
| Plaintiff, | C.A. No. |
| vs. | |
| THOMAS WILKINSON, ROBERT PLASCHKE, JAMES WALKER, MAURICE HOCHSCHILD, ALAN HOWE, JEFFREY D. JOHNSON, JOHN KNEUER, SUSAN G. SWENSON, and KENNY YOUNG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SONIM TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Akhil Gupta ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Sonim Technologies, Inc. ("Sonim" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Thomas Wilkinson, Robert Plaschke, James Walker, Maurice Hochschild, Alan Howe, Jeffrey D. Johnson, John Kneuer, Susan G. Swenson, and Kenny Young (collectively, the "Individual Defendants," and together with Sonim, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Sonim, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the

1

"Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sonim, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Sonim's current and/or former directors and officers from May 9, 2019 through the present (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's May 2019 initial public offering of stock ("the IPO"), and subsequent failures to correct them, and based on false assurances in SEC filings, on the Company's website, and in corporate governance documents, that Sonim is committed to workforce diversity—including with respect to board composition and selection as described herein, while acting in opposition to those statements.

2.     Sonim purports to be a leading U.S. provider of ultra-rugged mobile phones and accessories based on the Android platform, designed for task workers physically engaged in their work environments. The "task workers" Sonim's products are geared towards often work in

"mission-critical roles" in industries such as construction, energy and utility, hospitality, and the public sector, among others.

3.      Sonim's mobile phones are sold to three of the four largest wireless carriers (referred to by Sonim as its "channel partners") in the U.S., AT&T Inc., Sprint Corporation, and Verizon Communications Inc., and to the three largest carriers in Canada as well.

4.      The Company's "ultra-rugged" mobile phones are purportedly designed to withstand a variety of harsh environments. Sonim's mobile devices include: Sonim XP8 ("XP8") and Sonim XP5s ("XP5s"), launched in March 2018, and Sonim XP3 ("XP3"), launched in April 2019.

5.      In February 2019, the Company's management began acting on plans to take the Company public. On February 14, 2019, before the beginning of the Relevant Period, the Company filed a draft registration statement on Form DRS with the SEC. A couple months later, on April 15, 2019, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned IPO. On April 29, 2019, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 4,107,143 would be registered in the IPO, at a proposed maximum offering price per share of $15.00. A second amendment was filed with the SEC on May 9, 2019. The Registration Statement was declared effective the same day, on May 9, 2019.

6.      Subsequently, on May 13, 2019, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "Offering Documents." The Company's stock began trading publicly on the Nasdaq Global Market the next day, on May 10,

2019. Through the IPO, over 4 million shares of stock were sold at $11 per share, including additional shares sold through options exercised by the underwriters to the IPO. As a result of the IPO, Sonim received aggregate net proceeds of approximately $37.5 million, after deducting underwriter costs and expenses.

7.    The Offering Documents touted the purported functionality of Sonim's mobile phones and detailed the risks facing the Company with respect to, among other things, defects in Sonim's products. The Registration Statement provided that the Company had in the past and *may* in the future experience manufacturing defects that *could* reduce demand for Sonim's products and result in a loss of sales.

8.    However, these statements conveniently omitted certain crucial details—namely, that all three of the Company's mobile phones were in fact defected in some fashion, and that the possibility of defects disrupting the Company's sales in the future was not a mere hypothetical, but a serious risk that had already materialized due to existing vulnerabilities in Sonim's mobile devices.

9.    Specifically, the Registration Statement failed to disclose a significant design flaw in XP8 due to the Company's early implementation of a chipset created by Qualcomm, Inc. ("Qualcomm") called Snapdragon 630 OctaCore @ 2.2. GHz 64bit chipset ("Snapdragon"). Sonim was the first Company in North America to utilize Snapdragon in its XP8 mobile phones—and thus, became a "beta customer."[1] The Snapdragon chipset caused network connectivity issues with XP8. Customers who had purchased XP8 had lodged complaints about the defective phone prior to the IPO, stating, among other things, that the phone continuously dropped calls and was "not

---

[1]   Beta   customers   are   those   willing   to   test   or   trial   new   products. https://www.lexico.com/en/definition/beta_customer. Last visited September 16, 2020.

4

ready for release." Adequate testing would have identified the chipset defect and allowed Sonim to fix the issues with XP8 prior to the IPO.

10.     However, also unbeknownst to potential investors when the Company filed the Registration Statement and thereafter, Sonim failed to appropriately test its products in real-life, "mission critical" environments. Thus, the Company's other two mobile phones, XP5s and XP3 suffered software deficiencies that caused noise feedback when linked with accessories.

11.     Finally, the Registration Statement failed to disclose that the Company was already experiencing lower sales momentum for its mobile products due to the deficiencies discussed above at the time of the IPO.

12.     Importantly, the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the Offering Documents, until they could no longer conceal the truth about Sonim's products and performance from the investing public.

13.     On September 10, 2019, the Company issued a press release providing a "Corporate Update" to its financial guidance for the fiscal year ended December 31, 2019, and announcing the sudden departure of Sonim's Chief Financial Officer ("CFO"), Defendant James Walker ('Walker"). The press release announced that the Company expected net revenues to be "flat or slightly below net revenues . . .reported in fiscal 2018; GAAP net loss . . . to be up to $15 million; [and] [a]djusted EBITDA . . . to be a loss of up to $5 million." Only a few months earlier, in a July 2019 press release, the Company had announced financial guidance for the fiscal year 2019 that projected an "increase between 25% and 30% compared to $135.7 million reported in fiscal 2018[.]" The September 10, 2019 press release also revealed that "the company has experienced

technical challenges related to its XP8 smartphone and other general non-systemic, accessory-related issues in its feature phones, which cumulatively resulted in lost sales momentum."

14.     The same day, the Company hosted a conference call for analysts and investors, during which Sonim's then-Chief Executive Officer ("CEO"), Robert Plaschke ("Plaschke"), disclosed that Sonim had begun experiencing a loss in sales momentum due to the defects in XP8, XP5s, and XP3 in the second and third fiscal quarters of 2019, i.e., prior to the IPO. Defendant Plaschke confirmed that "we did experience some software challenges related to our XP8 smartphone and some other general non-systemic accessory-related issues with our feature phones."

15.     During the conference call, Defendant Plaschke explained how Sonim's early adoption of Qualcomm's Snapdragon rendered it a "beta customer" and that utilizing the chipset was "a gamble[.]" He further confessed to investors that Sonim had failed to adequately test its XP5s and XP3 in real-life environments and situations.

16.     Following the conference call, analysts responded or commented on Sonim's unexpected revelations. One analyst, Oppenheimer & Co., Inc., who had also participated in the IPO as an underwriter, issued a negative report the same day, stating that:

> We won't defend the indefensible. What could go wrong for Sonim went wrong. A large new customer lowered sales forecasts, delayed subsidies, and has been slower than expected in stocking retail locations. Additionally, the company experienced technical challenges in both the XP8 smartphone and accessory related issues in its feature phones. Finally, working through these issues has slowed down rollouts to smaller carrier customers. Put together, sales momentum has slowed and guidance was significantly cut. More importantly, management has lost credibility and the stock has become a show-me stock.

17.     Likewise, IPO underwriter Lake Street Capital Markets, LLC lowered its pricing of the Company, reiterating that "the Company had software issues with some of its devices which

diverted resources away from launching at Tier 2 carriers." National Securities Corporation, the last underwriter of the IPO, also dropped its pricing of Sonim from $17 to $9.

18.     On this news, the price of the Company's stock fell approximately 46.74%, or $3.30, tumbling from $7.06 per share at the close of trading on September 9, 2019 to $3.76 per share at the close of trading on September 10, 2019. Soon after, the first lawsuit in the State Securities Class Action (defined below) was lodged against the Company, certain of the Individual Defendants, and underwriters to the IPO. The Company's stock price continued to dwindle over the following month, closing at $3.15 per share on October 7, 2019, the day the first action was filed against the Company in the Federal Securities Class Action (defined below).

19.     On October 30, 2019, the Company issued a press release announcing the departure and replacement of Sonim's CEO, Defendant Plaschke.

20.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements in the Offering Documents regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) XP8's chipset was defective and experienced network connectivity issues traceable to Sonim's early adoption of Snapdragon; (2) customers who purchased and used XP8 lodged complaints with their carriers about the product's defects prior to the IPO; (3) XP8 was not the only phone with significant defects, Sonim's XP3 and XP5s were not appropriately field tested to perform in real-life environments and experienced software deficiencies, including noise feedback when linked to accessories; (4) the defects in XP8, XP3, and XP5s were not corrected prior to the IPO and negatively affected the Company's XP8, XP3, and XP5s product sales; and (5) the Company failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

21.     After the IPO, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

22.     Furthermore, one of the Individual Defendants further breached their fiduciary duties by engaging in lucrative insider sales in connection with the IPO, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, and before the truth was exposed. Defendant Plaschke, sold 30,000 shares of Company stock during the Relevant Period, obtaining proceeds of nearly $307,000.

23.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former CEO, its former CFO, six current or former members of its Board of Directors (the "Board") and the underwriters of the IPO to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Federal Securities Class Action") and a similar state consolidated class action lawsuit pending in the Superior Court of the State of California (the "State Securities Class Action," and together with the Federal Securities Class Action, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars. Indeed, on September 11, 2020, the plaintiff to the Federal Securities Class Action filed a motion for settlement, together with s stipulation of settlement, revealing that the Company had agreed to pay $2,000,000 in cash

to settle the claims in the Federal Securities Class Action. No other defendants in the Federal Securities Class Action are to be responsible for the settlement sum. *See Sterrett v. Sonim Technologies, Inc., et al*., Case No. 3:19-cv-06416-MMC (N.D. Cali.), D.I. 75-77. The Court in the Federal Securities Class Action preliminarily approved the settlement on November 6, 2020. *Id*., D.I. 105. In its latest quarterly report filed with the SEC on Form 10-Q on November 12, 2020, the Company recorded a $2.0 million accrual as of September 30, 2020 in connection with the settlement.

24.     As named defendants in the Securities Class Actions, Defendants Plaschke, Walker, Maurice Hochschild ("Hochschild"), Alan Howe ("Howe"), Kenny Young ("Young"), Susan G. Swenson ("Swenson"), John Kneuer ("Kneuer"), and Jeffrey D. Johnson ("Johnson"), are liable to Sonim for contribution under Sections 11(f) and 21D of the Exchange Act for the's Company liablity in the Securities Class Actions.

25.     Separate and apart from the aforementioned misconduct, the Individual Defendants also breached their fiduciary duties by, *inter alia*, falsely assuring the investing public in SEC filings, on the Company's website, and in corporate governance documents, that Sonim is committed to workforce diversity—including with respect to board composition and selection as described herein, while acting in opposition to those statements.

26.      Only half a century ago, almost every single board of directors in America was solely comprised of Caucasian males. Since, most corporations have made gradual but steady progress to inculcate more diverse representation on their boards and within their executive management teams.

27.     In a recent post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

> We are a country suffering from racial inequality. And we want the inequality and suffering to end.
>
> Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

28.     As a tech Company, Sonim's responsibility to engage and address the lack of diversity in its Company leadership is especially important. Leading up to the IPO, the tech industry had received increased criticism for "the number of women and racial minorities in its workforce, as those totals remain significantly lower than in the overall U.S. workforce."[2] Tech companies—particularly those in Austin, Texas, where Sonim is headquartered, have been taking measures over the past few years in response to these criticisms. In 2018, Chief Diversity Officer at Dell Technologies, Brian Reaves, stated in an interview: "I view this topic and what we're doing as important to the future business success of the company as anything we'll do technologically . . . . It's not something that's nice to do. It's really something one must do."

29.     Notwithstanding this societal imperative, while other companies have been dedicated to achieving a significant increase in diversity within their highest ranks, the Individual Defendants have caused Sonim to violate federal and state laws regarding diversity and discrimination by repeatedly refusing to nominate, appoint, and/or hire Black or Hispanic

---

[2] https://www.statesman.com/news/20180827/tech-firms-said-they-wanted-to-improve-diversity-have-they-. Last visited December 4, 2020.

individuals or other underrepresented minorities to the Board or Sonim's executive management team (the "Discriminatory Misconduct"). Ironically, Sonim holds itself out to be "an equal employment/affirmative action employer[.]" Yet, *zero* Black or Hispanic individuals reside on the Company's Board or work on the Company's executive management team.

30. Since taking the Company public in 2019, the Individual Defendants have attempted to save face by incorporating a section in Sonim's recent proxy statement related to diversity on the Board, in which the Company purports to consider race as a relevant factor in identifying nominees to serve on its Board. However, contrary to the foregoing and in violation of the Company's stated commitment to "providing a workplace that is free of discrimination of all types" and certain federal and state laws, the Individual Defendants have caused the Company to make no real efforts to promote diversity on its Board and among its senior executives. In fact, the word "diversity" barely appears in the Company's SEC filings, website, and governance documents unless it is being used to refer to the Company's investment portfolio.

31. Thus, in further breach of their fiduciary duties, the Individual Defendants permitted the Discriminatory Misconduct, engaged in and caused the Company to engage in the Discriminatory Misconduct, and continuously failed to maintain adequate controls.

32. Moreover, the Individual Defendants have deceived investors by claiming to abide by certain antidiscrimination policies. By engaging in the Discriminatory Misconduct, the Individual Defendants have breached their duty of candor and have also violated the federal securities laws.

33. Not only is the Discriminatory Misconduct unethical and illegal, it is also against the best interest of the Company, given that the companies with the most ethnically or culturally

diverse boards worldwide are 43% more likely to experience higher profits, according to a 2018 McKinsey & Company report.[3]

34.    The Individual Defendants also caused the Company to violate Section 14(a) of the Exchange Act, as the 2020 Proxy Statement (defined below) was false and misleading for failing to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black, Hispanic, and other underrepresented  individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates; and (4) the Company failed to maintain adequate internal controls.

35.    On September 24, 2020, Defendants Hochschild and Johnson, the only members of the Nominating and Corporate Governance Committee at the time, simultaneously resigned without explanation, effective September 27, 2020. In connection with Defendant Hochschild's departure and "in recognition of his longstanding service and contributions to the Company," the Board accelerated the vesting of 52,000 shares of the shares granted to him by the Company on June 9, 2020 and 5,000 of the shares granted to him on November 13, 2019.

36.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the

---

[3] https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx,  p.14.  Last visited December 4, 2020.

Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

38.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions.

39.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

40.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

41.     Venue is proper in this District because Sonim is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

42.     Plaintiff is a current shareholder of Sonim. Plaintiff has continuously held Sonim common stock at all relevant times.

### Nominal Defendant Sonim

43.     Sonim is a Delaware corporation with its principal executive offices at 6836 Bee Cave Road, Building 1, Suite 279, Austin, Texas 78746. Sonim's shares trade on the Nasdaq under the ticker symbol "SONM."

### Defendant Wilkinson

44.     Defendant Thomas Wilkinson ("Wilkinson") has served as Sonim's CEO and as a Company director since October 2019. According to the Company's Schedule 14A filed with the SEC on August 24, 2020 (the "2020 Proxy Statement"), as of August 14, 2020, Defendant Wilkinson beneficially owned 202,500 of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Wilkinson owned approximately $196,425 worth of Sonim stock.

45.     For the fiscal year ended December 31, 2019, of which Defendant Wilkinson served at Sonim a mere two months, he received $339,369 in compensation from the Company. This included $93,269 in salary and $246,100 in option awards. Pursuant to his employment agreement with the Company, Defendant Wilkinson is entitled to an annual salary of $400,000 and an annual bonus plan of 100% his base salary, among other valuable benefits.

46.     The 2020 Proxy Statement stated the following about Defendant Wilkinson:

*Thomas W. Wilkinson* has served as our Chief Executive Officer and a member of our board of directors since October 2019. Mr. Wilkinson has served as a strategic consultant and financial advisor to small and medium-sized public and privately held businesses since January 2014. From August 2015 until October 2017, Mr. Wilkinson served as Chief Financial Officer and later as Chief Executive Officer at Xplore Technologies Corp., a rugged tablet technology company, which was sold to Zebra Technologies in 2018. Prior to his service at Xplore, from January 2014 to October 2015, he served as Chief Financial Officer at Amherst Holdings, LLC, a financial services company. Mr. Wilkinson was the co-founder and Managing Partner of PMB Helin Donovan, a multi-office regional accounting firm. He currently serves on the board of directors of Astrotech Corporation, a science and technology development and commercialization company, and chairs the board of directors at CipherLoc Corporation, a data security solutions company, where he also served as the interim Chief Executive Officer from July 2019 to November 2019. Mr. Wilkinson received a Master's of Professional Accounting and a Bachelors of Business Administration each from University of Texas at Austin in 1992. The Nominating and Corporate Governance believes that Mr. Wilkinson is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our Chief Executive Officer.

**Defendant Plaschke**

47.     Defendant Plaschke served as Sonim's CEO and as a Company director from December 2005 until his resignation in October 2019. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Plaschke beneficially owned 670,036 of the Company's common stock, which represented 1.02% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Plaschke owned approximately $649,934 worth of Sonim stock.

48.     For the fiscal year ended December 31, 2019, Defendant Plaschke received $6,189,707 in compensation from the Company. This included $333,333 in salary, $4,948,147 in stock awards, $685,486 in option awards, and $222,741 in all other compensation.

49.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Plaschke made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| May 22, 2019 | 30,000 | $10.23 | $306,900 |

50.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

51.     The Prospectus stated the following about Defendant Plaschke:

***Robert Plaschke*** has served as our Chief Executive Officer and a member of our board of directors since December 2005. From 2002 to 2005, Mr. Plaschke served in multiple roles at Sonim, including Chief Financial Officer, Chief Marketing Officer and Head of Business Development. From 2001 to 2002, Mr. Plaschke served as Entrepreneur in Residence at Sutter Hill Ventures, a venture capital firm, where he served as a senior executive for a venture capital fund. Mr. Plaschke

received a M.B.A. from the University of Chicago and a B.S. in Computer Engineering from Northwestern University.

We believe that Mr. Plaschke is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our Chief Executive Officer.

**Defendant Walker**

52.     Defendant Walker served as the Company's CFO from January 2018 until he was terminated in September 2019.

53.     For the fiscal year ended December 31, 2019, Defendant Walker received $1,203,314 in compensation from the Company. This included $194,792 in salary, $415,720 in stock awards, $386,552 in option awards, and $206,250 in all other compensation.

54.     The Prospectus stated the following about Defendant Walker:

***James Walker*** has served as our Chief Financial Officer since January 2018. From March 2014 to November 2017, Mr. Walker served as a consulting chief financial officer of The Brenner Group, LLC, a professional services and consulting company. From January 2012 to March 2014, Mr. Walker served as the Chief Financial Officer of Spigit, Inc., a management software provider. Mr. Walker received a M.B.A. from Santa Clara University and a B.A. in Mathematics from San Jose State University.

**Defendant Hochschild**

55.     Defendant Hochschild served as a Company director from November 2012 until September 2020 and as Chairman of the Board from March 2019 until March 2020. He also served as Chairperson of the Nominating and Corporate Governance Committee until his recent resignation. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Hochschild beneficially owned 20,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Hochschild owned approximately $19,400 worth of Sonim stock.

56.     For the fiscal year ended December 31, 2019, Defendant Hochschild received

$164,718 in compensation from the Company. This included $43,071 in fees earned or cash paid, $37,200 in stock awards, and $84,447 in option awards.

57.     The 2020 Proxy Statement stated the following about Defendant Hochschild:

**Maurice Hochschild** has served as a member of our board of directors since November 2012 and as Chairman of our board of directors from March 2019 until March 2020. Since 2001, Mr. Hochschild served in various roles at Investec Bank plc, an international specialist banking and asset management group, including Global Head of the Project and Infrastructure Finance division, which financed and developed renewable and thermal power generation, transportation and social infrastructure in Western Europe, Southern Africa, Australia and North America. Mr Hochschild also served as the head of the North American Commercial and Institutional Banking division of the bank, which undertook securities distribution, power and infrastructure finance and fund financing in North America. Mr Hochschild resigned from Investec in March 2019, and became founding Managing Director of Via Novus, an institutionally backed developer, owner and operator of high power, public charging stations for electric vehicles. Mr. Hochschild received a B.A. from the University of Pennsylvania and serves on other boards including Tindall Riley & Co (UK) and Engenie Limited (UK). The Nominating and Corporate Governance believes that Mr. Hochschild's extensive experience in project development and public infrastructure qualifies him to serve on our board of directors.

### Defendant Howe

58.     Defendant Howe has served as a Company director since October 2017. He also serves as Chairperson of the Audit Committee. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Howe beneficially owned 20,034 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Howe owned approximately $19,432 worth of Sonim stock.

59.     For the fiscal year ended December 31, 2019, Defendant Howe received $153,790 in compensation from the Company. This included $32,143 in fees earned or cash paid, $37,200 in stock awards, and $84,447 in option awards.

The 2020 Proxy Statement stated the following about Defendant Howe:

*Alan Howe* has served as a member of our board of directors since October 2017. Since April 2001, Mr. Howe has served as co-founder and Managing Partner of Broadband Initiatives, LLC, a boutique corporate development and strategic consulting firm since 2001. Previously, Mr. Howe held various executive management positions at Covad Communications, Inc., a provider of broadband voice and data communications, Teletrac, Inc., a location-tracking software company, Sprint Corporation, a telecommunications company, and Manufacturers Hanover Trust Company, a commercial bank. Mr. Howe currently serves on the boards of Babcock and Wilcox, a company providing environmental technologies for the power industry, Orion Energy Systems, Inc., a LED lighting and intelligent controls company, Resonant Inc., a hardware development company for mobile devices, and Data I/O Corporation, a systems manufacturer for integrated circuits (as Chairman). Mr. Howe previously served on the board of directors for magicJack, VocalTec, Ltd., a cloud communications company, CafePress, an online retailer of user-customized products, Urban Communications, a provider of fiber optic services, Qualstar Corporation, a data storage products manufacturer, Determine. Inc., a provider of life cycle management solutions software, and Widepoint Corporation, a provider of technology products and services. The Nominating and Corporate Governance Committee believes that Mr. Howe's extensive financial, executive and board experience with multiple private and public companies qualifies him to serve on our board of directors.

**Defendant Johnson**

60.     Defendant Jeffrey D. Johnson ("Johnson") served as a Company director from March 2019 until September 2020. He also served as a member of the Nominating and Corporate Governance Committee until his recent resignation. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Johnson beneficially owned 8,334 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Johnson owned approximately $8,083 worth of Sonim stock.

61.     For the fiscal year ended December 31, 2019, Defendant Johnson received $163,902 in compensation from the Company. This included $25,071 in fees earned or cash paid, $37,200 in stock awards, and $101,631 in option awards.

62.     The 2020 Proxy Statement stated the following about Defendant Johnson:

*Jeffrey D. Johnson* has served as a member of our board of directors since March 2019 and previously served as a member of our board of directors from July 2017 to April 2018. Since 2010, Mr. Johnson has served as the Chief Executive Officer of the Western Fire Chiefs Association, a registered non-profit, and a division of the International Association of Fire Chiefs. Since 2016, he has served as the Chief Executive Officer of Brody's Meats, Inc., a privately held smoked meat company. Since October 2015, Mr. Johnson has also served as the Chief Executive Officer of High Desert Holdings Commercial Prop, a privately held commercial real estate holding company. From 2012 until August 2018, he served as Vice President of the Board of Directors of FirstNet. From 1995 until 2010, he served as the Tualatin Valley Fire and Rescue Chief. Mr. Johnson received a B.S. in Business and Communications from Concordia University. The Nominating and Corporate Governance Committee believes that Mr. Johnson's extensive leadership experience in local and national public safety and advisory and board roles for numerous technology companies qualifies him to serve on our board of directors.

### Defendant Kneuer

63.    Defendant John Kneuer ("Kneuer") has served as a Company director since March 2019 and as Chairman of the Board since March 2020. He also serves as a member of the Audit Committee and the Compensation Committee. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Kneuer beneficially owned 9,147 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Kneuer owned approximately $8,872 worth of Sonim stock.

64.    For the fiscal year ended December 31, 2019, Defendant Kneuer received $152,504 in compensation from the Company. This included $30,857 in fees earned or cash paid, $37,200 in stock awards, and $84,447 in option awards.

65.    The 2020 Proxy Statement stated the following about Defendant Kneuer:

*John Kneuer* has served as a member of our board of directors since March 2019 and as Chairman of our board of directors since March 2020. Since November 2007, Mr. Kneuer has served as the founding Managing Member of JKC Consulting LLC, a strategic consulting and advisory firm. He has also served as Senior Advisor to the American Continental Group, a public policy consulting firm, since April 2017. Since June 2017, Mr. Kneuer has served on the Board of Directors of TerreStar Corporation, a telecommunications company. From 2011 until 2018,

he served as a member of the Board of Directors of Globalstar, Inc., a satellite communications company, where he served as a member of the audit and compensation committees. From October 2003 to November 2007, Mr. Kneuer served first as the Deputary Assistant Secretary, and then as U.S. Assistant Secretary, of Commerce for Communications and Information. As Assistant Secretary, Mr. Kneuer served as Administrator of the National Telecommunications and Information Administration. Mr. Kneuer received a B.A. and J.D. from Catholic University of America. The Nominating and Corporate Governance Committee believes that Mr. Kneuer's extensive business consulting experience and leadership experience at various strategic consulting and communications companies as well as federal telecommunications authorities qualifies him to serve on our board of directors.

**Defendant Swenson**

66.     Defendant Susan G. Swenson ("Swenson") has served as a Company director since March 2019. She also serves as Chairperson of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Swenson beneficially owned 5,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Swenson owned approximately $4,850 worth of Sonim stock.

67.     For the fiscal year ended December 31, 2019, Defendant Swenson received $155,718 in compensation from the Company. This included $34,071 in fees earned or cash paid, $37,200 in stock awards, and $84,447 in option awards.

68.     The 2020 Proxy Statement stated the following about Defendant Swenson:

***Susan G. Swenson*** has served as a member of our board of directors since March 2019. From August 2012 to August 2018, Ms. Swenson served on the board of FirstNet and chaired the board of directors from August 2014 to August 2018. From October 2015 to June 2017, Ms. Swenson served as Chairperson and Chief Executive Officer of Inseego Corporation, a wireless internet solutions and telematics provider, and served as the Board Chairperson from April 2014 to June 2017. From February 2004 to October 2005, Ms. Swenson served as the President and Chief Operating Officer of T-Mobile US, Inc., a wireless network operator. From 1999 to 2004, Ms. Swenson served as President of Leap Wireless International, Inc., a telecommunications operator, and Chief Executive Officer of

Cricket Communications, Inc., a prepaid wireless service provider and subsidiary of Leap. Ms. Swenson also served as Chief Executive Officer of Sage North America from 2008 to 2011. Since March 2012, Ms. Swenson has served on the board of Harmonic, Inc., a video delivery, and media company. Since October 2018, Ms. Swenson she has served as Chairman of the Board of Directors of Vislink Technologies, Inc., a video capture and broadcasting company. Ms. Swenson previously served on the board of directors of Wells Fargo from November 1994 to December 2017. Ms. Swenson received a B.A. in French from San Diego State University. The Nominating and Corporate Governance Committee believes that Ms. Swenson's extensive leadership experience at various media and communications companies and at FirstNet qualifies her to serve on our board of directors.

### Defendant Young

69.     Defendant Kenny Young ("Young") has served as a Company director since October 2017. He also serves as a member of the Compensation Committee and has served as Chairperson of the Nominating and Corporate Governance Committee since September 2020. According to the 2020 Proxy Statement, as of August 14, 2020, Defendant Young, in his capacity as the President of Sonim's largest stockholder, B. Riley Financial, Inc. ("B. Riley"), and the CEO of B. Riley Principal Investments, LLC, beneficially owned 11,819,577 shares of the Company's common stock, which represented 17.93% of the Company's outstanding shares of common stock on that date.  Given that the price per share of the Company's common stock at the close of trading on August 14, 2020 was $0.97, Defendant Young and B. Riley with its affiliates owned approximately $11.4 million worth of Sonim stock.

70.     For the fiscal year ended December 31, 2019, Defendant Young received $50,000 in compensation from the Company prior to the IPO pursuant to a management services agreement between Sonim and B. Riley.

71.     The 2020 Proxy Statement stated the following about Defendant Young:

***Kenny Young*** has served as a member of our board of directors since October 2017. Since July 2018, Mr. Young has served as President of B. Riley Financial, Inc. Since October 2017, Mr. Young has also served as Chief Executive Officer of Babcock & Wilcox Enterprises Inc., a provider of energy and environmental

technologies and services. Since October 2016, Mr. Young has served as Chief Executive Officer of B. Riley Principal Investments, a wholly owned subsidiary of B. Riley Financial, Inc. In addition, since November 2018, Mr. Young has served as Chief Executive Officer of magicJack VocalTec Ltd., a cloud communications company. Since 2016, Mr. Young has served as Chief Executive Officer of United Online, Inc., an internet, and communications services provider. Each of magicJack VocalTec Ltd. and United Online, Inc. is a wholly owned subsidiary of B. Riley Financial, Inc. From 2008 to 2016, Mr. Young served in numerous leadership roles at Lightbridge Communications Corporation, a telecommunications services company, including as President and Chief Executive Officer of Lightbridge Communications Corporation International and President of Americas and Chief Operating Officer of Lightbridge Communications Corporation. Mr. Young currently serves on the board of directors of Orion Energy Systems, a LED lighting and intelligent controls company. Mr. Young previously served on the boards of directors of FRG Inc. (formerly Liberty Tax Inc.), a provider of tax services, Bebe Stores, Inc., a women's apparel retailer, Imagine Communications Corporation, a media services company, Global Star, Inc., a satellite communications company, B. Riley Financial Inc., a full service investment bank, Standard Diversified Inc., a holding company for various industrial businesses, and Proxim Wireless Corporation, a broadband wireless networking company. Mr. Young received a M.B.A. in Business from Southern Illinois University, Edwardsville, and a B.S. in Computer Science and Mathematics from Graceland University. The Nominating and Corporate Governance Committee believes that Mr. Young's extensive operational, executive and board experience with numerous companies primarily within the communications and finance industries qualifies him to serve on our board of directors.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

72.     By reason of their positions as officers, directors, and/or fiduciaries of Sonim and because of their ability to control the business and corporate affairs of Sonim, the Individual Defendants owed Sonim and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sonim in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Sonim and its shareholders so as to benefit all shareholders equally.

73.     Each director and officer of the Company owes to Sonim and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sonim, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75.     To discharge their duties, the officers and directors of Sonim were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sonim, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Sonim's Board at all relevant times.

77.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and directors of Sonim were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Sonim were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sonim's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sonim conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sonim and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sonim's operations would comply with all applicable laws and Sonim's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.    Each of the Individual Defendants further owed to Sonim and the shareholders the duty of loyalty requiring that each favor Sonim's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sonim and were at all times acting within the course and scope of such agency.

81.     Because of their advisory, executive, managerial, and directorial positions with Sonim, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sonim.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

85.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who is a director of Sonim was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sonim and was at all times acting within the course and scope of such agency.

## SONIM'S CODE OF CONDUCT AND GOVERNANCE

88.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") provides that it "applies to all employees, officers and directors of Sonim and its subsidiaries." The Code of Conduct also maintains that, "all must follow the law, act with integrity and honesty in all matters, and be accountable for our actions. We have high ethical standards for ourselves and our vendors. Lying, either overtly or through holding back information, is not something Sonim teams do."

89.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

employees, officers and directors should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of Sonim, including when an employee, officer, or director, or his or her family member, receives improper personal benefits as a result of his or her position with Sonim. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from

influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided.

90.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

Sonim is committed to being honest and truthful with all of its customers, vendors, and other business partners. Never misrepresent the quality, features or availability of our products, and never do anything illegal or unethical to win business.

Trying to obtain information by lying or pretending to be someone you are not is unethical and could be illegal. Do not do it. And if you receive another company's confidential or proprietary information by mistake, return or destroy it. You may also reach out to the Legal team if you have questions.

91.     In a section titled, "Business and Financial Records," the Code of Conduct states

the following:

The integrity of the Company's records depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, the Company's corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial or operational results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

* * *

Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

• all employees must cooperate fully with our Finance Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete;

• no employee, director or person acting under their direction, may coerce, manipulate, mislead or fraudulently influence our Finance Department, our independent public accountants or counsel, if the employee, director or other person knows or should know that the action, if successful, could result in rendering the Company's financial statements materially misleading; and

• no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

* * *

**Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, our General Counsel, Stephanie Sogawa, the Audit Committee or one of the other compliance resources.**

92.     In a section titled, "Accurate Financial and Accounting Disclosures," the Code of Conduct states the following, in relevant part:

Our principal executive officer, principal financial officer and people who perform similar functions are our "senior financial officers" and are responsible for ensuring that disclosures in our periodic reports and other public communications are full, fair, accurate, timely and understandable.

93.     The Code of Conduct further prohibits employees from taking "unfair advantage of anyone through manipulation, concealment, abuse of privileged information or by making any untrue statement of a material fact or omitting to state a material fact necessary to prevent any statement made from being misleading."

94.     In a section titled, "Compliance with Laws," the Code of Conduct states that employees are expected "to understand the legal and regulatory requirements applicable to their business units and areas of responsibility." The Code of Conduct further states that "[d]isregard of the law will not be tolerated."

95.     With respect to "Insider Trading Laws," the Code of Conduct states, *inter alia*, "[t]o use material non-public information in connection with buying or selling securities, including 'tipping' others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information."

96.     As stated on the Company's website,[4] the Code of Conduct maintains in a section titled, "Build Trust and Credibility," that "[t]he success of our business is dependent on the trust and confidence we earn from our employees, customers and shareholders. We gain credibility by adhering to our commitments, displaying honesty and integrity and reaching company goals solely through honorable conduct. It is easy to say what we must do, but the proof is in our actions. Ultimately, we will be judged on what we do."

97.     The Code of Conduct also highlights the Company's "Respect for the Individual," stating:

> [w]e all deserve to work in an environment where we are treated with dignity and respect. Sonim is committed to creating such an environment because it brings out the full potential in each of us, which, in turn, contributes directly to our business success. We cannot afford to let anyone's talents go to waste.
>
> Sonim is an equal employment/affirmative action employer and is committed to providing a workplace that is free of discrimination of all types from abusive, offensive or harassing behavior. Any employee who feels harassed or discriminated against should report the incident to his or her manager or to human resources.

---

[4] https://www.sonimtech.com/about/code-of-conduct/. Last visited December 7, 2020.

98.     In a section titled, "Set Tone at the Top," the Code of Conduct states, in relevant part, "[m]anagement has the added responsibility for demonstrating, through their actions, the importance of this Code. In any business, ethical behavior does not simply happen; it is the product of clear and direct communication of behavioral expectations, modeled from the top and demonstrated by example. Again, ultimately, our actions are what matters."

**Charter of The Nominating and Corporate Governance Committee**

99.     Sonim's Charter of the Nominating and Corporate Governance Committee of the Board provides that the purpose of the Nominating and Corporate Governance Committee is to

> (i) oversee all aspects of the Company's corporate governance functions on behalf of the Board; (ii) make recommendations to the Board regarding corporate governance issues; (iii) identify, review and evaluate candidates to serve as directors of the Company consistent with the criteria approved by the Board and review and evaluate incumbent directors; (iv) serve as a focal point for communication between such candidates, non-committee directors and the Company's management; (v) make recommendations to the Board regarding the selection and approval of candidates to serve as nominees for director to be submitted to a shareholder vote at the annual meeting of shareholders; and (vi) make other recommendations to the Board regarding affairs relating to the directors of the Company, including director nominees for each committee of the Board.

100.    The Charter of the Nominating and Corporate Governance Committee further provides that the committee's responsibilities include, "identifying, reviewing and evaluating candidates to serve on the Board consistent with criteria approved by the Board, including consideration of any potential conflicts of interest as well as applicable independence, experience and other requirements[,]" and "reviewing, evaluating and considering the recommendation for nomination of incumbent directors for re-election to the Board, as well as monitoring the size of the Board." The committee is also required to "periodically review, discuss and assess the performance of management and the Board, including Board committees, seeking input from

senior management, the full Board and others." Pursuant to the Charter of the Nominating and

Corporate Governance Committee, such assessment shall include, among other things:

> evaluation of the Board's contribution as a whole and the Board's effectiveness in
> serving the best interests of the Company and its shareholders, specific areas in
> which the Board and/or management believe contributions could be improved, and
> overall Board composition and makeup, including the reelection of current Board
> members. The factors to be considered shall include whether the directors, both
> individually and collectively, can and do provide the integrity, experience,
> judgment, commitment (including having sufficient time to devote to the Company
> and the level of director participation), skills, diversity and expertise appropriate
> for the Company. In assessing the directors, both individually and collectively, the
> Committee may consider the current needs of the Board and the Company to
> maintain a balance of knowledge, experience and capability in various areas.

**Corporate Governance Guidelines**

101.    The Company's Corporate Guidelines states in relevant part that:

> The Board considers recommendations for nominees from the Nominating and
> Corporate Governance Committee. The Board will consider the minimum general
> criteria set forth below, and may add any specific additional criteria with respect to
> specific searches, in selecting candidates and existing directors for service on the
> Board. An acceptable candidate may not fully satisfy all of the criteria, but is
> expected to satisfy nearly all of them.
>
> In considering candidates recommended by the Nominating and Corporate
> Governance Committee, the Board intends to consider such factors as possessing
> relevant expertise upon which to be able to offer advice and guidance to
> management, having sufficient time to devote to the affairs of Sonim, demonstrated
> excellence in his or her field, having the ability to exercise sound business judgment
> and having the commitment to rigorously represent the long-term interests of our
> stockholders. ***The Board reviews candidates for director nomination in the
> context of the current composition of the Board, the operating requirements of
> Sonim and the long-term interests of our stockholders. In conducting this
> assessment, the Board considers diversity, age, skills, and such other factors as it
> deems appropriate given the current needs of the Board and Sonim to maintain
> a balance of knowledge, experience and capability***. In the case of incumbent
> directors whose terms of office are set to expire, the Board reviews such directors'
> overall service to Sonim during their term, including the number of meetings
> attended, level of participation, quality of performance, and any other relationships
> and transactions that might impair such directors' independence.

(Emphasis added.)

102.    The Corporate Governance Guidelines further provide that the "Board does not believe it should limit the number of terms for which an individual may serve as a director[]" even though it concedes that term limits could help ensure that there are "new ideas and viewpoints" available to the Board.

103.    In violation of the Code of Conduct, the Charter of the Nominating and Corporate Governance Committee, and Sonim's Corporate Governance Guidelines, the Individual Defendants engaged in or permitted the Discriminatory Misconduct and conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof.  Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

104.    Sonim is an Austin, Texas-based communications company founded in 1999. The Company touts itself as a leading provider of ultra-rugged mobile phones and accessories designed specifically for task workers who are physically engaged in mission-critical work environments, such as construction, energy and utility, hospitality, and public sector service industries. Sonim's

mobile devices are sold to three of the four largest carriers in the U.S., AT&T Inc., Sprint Corporation, and Verizon Communications Inc., and the three largest carriers in Canada, Bell, Rogers and Telus Mobility.

105.    Sonim's products and technology include its ruggedized mobile phones, accessories, and a suite of cloud applications. The Company's mobile devices also support FirstNet, a high-speed broadband network established by AT&T Inc. for public safety.

106.    Sonim's mobile devices are designed to withstand a variety of harsh environments and include a variety of features to support this functionality, including puncture, shock, and impact resistance, waterproof and dustproof construction, multi-shift battery life, extra-loud audio, glove-friendly design, temperature resistance, and chemical resistance.

107.    At the time of its IPO, the Company marketed three mobile devices: XP8, XP5s, and XP3. Sonim continues to offer these mobile devices today. XP8, launched in March 2018, is an Android-based smartphone equipped with a glove-friendly display, ultra-rugged exterior, and programmable buttons. XP5s, also launched in March 2018 and XP3, launched in April 2019, are Sonim's feature phones. XP5s is equipped with, *inter alia*, a 2.64-inch non-touch display, dual front-facing loud speakers, and access to Sonim's industrial accessories. XP3 is designed to deliver reliable voice-centric experiences to users in industrial environments. *See* image below, retrieved from        https://www.prnewswire.com/news-releases/sonimware-enterprise-mobility-software-enables-seamless-deployment-management-and-support-for-sonim-ultra-rugged-devices 301109570.html. Last visited September 17, 2020.



108.    The Company marketed XP8 for "those who serve" engaged in "missions that demand much more than voice communication." From the outset, XP8 was launched with Qualcomm's Snapdragon chipset. At the time of the IPO and thereafter, the investing public remained unaware of the "gamble" Sonim assumed by becoming the first company to launch Snapdragon in North America. Sonim's early adoption of Snapdragon resulted in XP8's defective design and caused XP8 users to experience network connectivity issues with the mobile device. Adequate testing would have allowed the Company to identify and mitigate disfunctions in XP8 before taking the Company public. Similarly, XP5s is marketed "for missions critical communication[]" to "meet the needs of those who serve." The Company's latest mobile device released prior to the IPO, XP3, is also marketed as "[i]n extreme working environments, reliability saves the day." However, the Company failed to adequately field test its feature phones. As a result, XP5s and XP3 suffered software deficiencies that caused noise feedback when the devices were connected to accessories.

109.     The Sonim App launched in 2013, and was a quick success, garnering over 60,000 daily users only ten weeks after the App first became available. During this period, the Company raised millions of dollars in financing from various venture capital firms, including Accel, Andreessen Horowitz, Social Capital LP, and their related entities, which would go on to become large shareholders of the Company.

### Customer Complaints About XP8 Prior to the IPO

110.     Unbeknownst to investors until well after the IPO, as discussed above, XP8 also suffered from a chipset defect that impacted the phone's network connectivity functionality. Even before the IPO, customers of carriers that purchased and used XP8 lodged complaints about a host of technical issues they experienced with the phone, such as dropping calls. To illustrate, customers reviewing XP8 on AT&T Inc.'s website stated the following:

> Nobody should ever buy this phone! it is the most utter piece of garbage ever. I have had it since November 2018 and it is always freezing up on me and the camera sucks. you will thank yourself everyday for not buying the piece of garbage phone.
>
> * * *
>
> My husband is rough on phones so he decided to go with this one. It's definitely rugged and tough. Unfortunately, it is terrible. Constantly dropping calls, shutting down, very difficult to maneuver from on thing to the next. It came with VERY little instructions and we hate it. Unfortunately, we have no choice but to keep it until it's paid off - gonna be a LONG year!
>
> * * *
>
> Its tough, but the O.S. is years old. The phone is slow and laggy. Low resolution screen, and way too heavy to be practical. You'd be far better off to buy a normal Apple or Android phone and a decent case.
>
> * * *
>
> This phone was not ready for release. Several software bugs, including no ability to prevent the phone from auto-connecting to open ATTWIFI hotspots without turning wifi completely off. Built-in hot spot crashes when using openVPN, screen freezes constantly, several apps that are fine on other phones crash on this one, no

ability to remove ATT bloatware, settings rabdomly [sic] change and turn off cellular data, and more. I wish I never bought this phone.

* * *

I've had it for a couple of weeks now and am seriously regretting this purchase. No wifi calling, terrible camera, picture/video messages won't open, there is a delay in the keyboard. I bought it because of the rugged design and didn't pay enough attention to the guts of the phone. It's like an old Motorola Droid. Waste of money.[5]

### Sonim's IPO

111.     In February 2019, the Individual Defendants began implementing steps to take the Company public. On February 14, 2019, the Company filed a draft registration statement on Form DRS with the SEC. A couple months later, on April 15, 2019, the Company filed the Registration Statement. On April 29, 2019, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 4,107,143 would be registered in the IPO, at a proposed maximum offering price per share of $15.00. A second amendment was filed with the SEC on May 9, 2019. The Registration Statement was declared effective the same day, on May 9, 2019.

112.     Subsequently, on May 13, 2019, the Company filed with the Prospectus on Form 424B4. The Company's stock began trading publicly on the Nasdaq Global Market the next day, on May 10, 2019. Through the IPO, over 4 million shares of stock were sold at $11 per share, including additional shares sold through options exercised by the underwriters to the IPO. The IPO closed on May 14, 2019, with the Company having sold 3,571,429 shares of Company stock to the public at $11 per share. On May 22, 2019, the Company sold an additional 505,714 shares of common stock and Defendant Plaschke sold 30,000 shares to the public for $11 per share, pursuant to the option for underwriters to purchase additional shares in the IPO. As a result of the IPO,

---

[5] https://www.att.com/buy/phones/sonim-xp8-64gb-black.html. Last visited September 17, 2020.

Sonim received aggregate net proceeds of approximately $37.5 million, after deducting underwriter costs and expenses.

**The Individual Defendants' Duty to Disclose**

113.   SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Sonim, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required Sonim to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

114.   Additionally, Item 105 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Offering Documents "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

115.   As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the fact that the Sonim's phones had undisclosed vulnerabilities that would lead to significant technical disruptions, and as a result negatively affect the Company's sales of its XP8, XP5, and XP3 phones, as these facts constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Sonim speculative or

risky.

116.     Even after the IPO was effectuated, the Individual Defendants had a duty to disclose pursuant to Item 303(a)(3) of Regulation S-K, which requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's Discussion and Analysis of Financial Condition and Results of Operations" section that describes, *inter alia*, (i) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of income from continuing operations"; (ii) "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues"; and (iii) "(A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations."

117.     Therefore, the Individual Defendants had a duty to cause the Company to disclose all material facts related to Sonim's deficient product chipset and other issues Sonim had been experiencing with its primary products leading up and following the IPO. These defects would foreseeably—and did impact the Company's financial performance and prospects.

**<u>False and Misleading Statements</u>**

***The Offering Documents***

118.     On April 15, 2019, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the IPO. The Registration Statement was signed by Defendants Plaschke, Walker, Hochschild, Howe, Young, Swenson, Kneuer, and Johnson. The Company subsequently filed two amendments to the Registration Statement, and the Registration Statement was declared effective on May 9, 2019.

119.     On May 13, 2019, shortly after the Company's stock began trading on Nasdaq, the Company filed the Prospectus with the SEC, in connection with the IPO. The Prospectus formed

part of and was incorporated into the Registration Statement.

120.     The Offering Documents discussed in detail the Company's product offerings and the characteristics of its mobile devices, touting the relevancy of Sonim's "[r]uggedized solutions" for task workers engaged in mission critical work environments. Specifically, the Offering Documents stated:

> We are a leading U.S. provider of ultra-rugged mobile phones and accessories designed specifically for task workers physically engaged in their work environments, often in mission-critical roles. We currently sell our ruggedized mobile phones and accessories to three of the four largest wireless carriers in the United States—AT&T, Sprint and Verizon—as well as the three largest wireless carriers in Canada—Bell, Rogers and Telus Mobility. ***Our phones and accessories connect workers with voice, data and workflow applications in two end markets: industrial enterprise and public sector.***
>
> Task workers in these end markets have historically been limited to pen and paper and single-purpose electronic devices, such as barcode scanners, location-tracking devices and sensors, to accomplish specific daily tasks. These single-purpose devices have historically run on proprietary networks, such as land mobile radio, or LMR, networks, which enable push-to-talk, or PTT, services for voice communications. ***We provide Android-based devices that consolidate and integrate multiple functions into a single ruggedized solution running on commercial wireless networks at a total cost of ownership that we believe is significantly lower than comparable offerings with improved productivity and safety of task workers.***

(Emphasis added.)

121.     The Offering Documents also detailed the features of Sonim's mobile products that made them well-suited to serve and protect field employees engaged in a range of work environments, stating in relevant part:

> Communication, productivity and safety among task workers has always been a central requirement in business-critical and mission-critical environments. Organizations with remote and disparate workers—from police and firefighters to construction, oil rig and manufacturing workers—need an extremely durable solution that provides reliable and secure voice, data and workflow applications.
>
> Ruggedized mobile phones are well-suited for industrial enterprise and other critical infrastructure applications due to their durability and functionality in a range of environments. Equipping workers with smarter mobile phones also enables more

40

efficient communication with and between field employees, and enhances the information that decision-makers use to deploy resources within their organizations.

*Industrial Enterprise Market Opportunity*

We estimate that in the United States and Canada in 2018, there were 37.6 million task workers across verticals in our industrial enterprise end markets who could benefit from our solutions, including construction, energy and utility, facilities management, manufacturing and transportation and logistics. ***The extreme durability and enhanced voice and text communication capabilities of our devices enable these workers to be stationed in remote and hazardous environments, while remaining connected to their central command center at all times.***

122.    The Management's Discussion and Analysis of Financial Condition and Results of Operations section set forth in the Offering Documents, maintained that, "[o]ur phones and accessories connect workers with voice, data and workflow applications in two end-markets: industrial enterprise and public sector."

123.    In describing the features of the Company's mobile phones, the Offering Documents stated that "[o]ur mobile phones . . . use[] noise cancellation technology for loud background noise environments." The Offering Documents further provided, in relevant part:

> ***Enhanced functionality through software and hardware configurations.*** Our solutions allow end customers and task workers to customize our mobile phones using Android-based applications and vertical-specific accessories to address their varying needs. Enterprises and agencies can leverage the millions of applications available on the Google Play Store, our dozens of device-specific APIs, and our industrial accessories to create a purpose-built solution to meet the specific use cases of their task workers. For example, school bus operators can combine our ruggedized phones, an industrial car kit, a PTT application that leverages our APIs and a location-tracking application to ensure that they have a solution that enables constant communication with dispatchers that is compliant with the U.S. Department of Transportation's hands-free driving regulations and that can also automatically alert parents of route delays. The ability for enterprises and agencies to customize their solutions allows their task workers to use a single device for tasks that would previously require multiple and often more costly devices.
>
> * * *
>
> In addition, our devices provide a wide range of connectivity options for our end customers (including LTE, 3G, GSM, WiFi, NFC, location tracking and Bluetooth

for certain of our devices), and our XP5s and XP8 phones support a wide range of global frequencies allowing them to be used almost anywhere in the world where there is cellular coverage.

124.    In a subsection discussing the various risks affecting Sonim's business, the Offering Documents described hypothetical risks emanating from, among other things, potential defects in the Company's products—implying that such risks had not already materialized. Specifically, the Offering Documents stated, "[d]efects in our products could reduce demand for our products and result in a loss of sales, delay in market acceptance and injury to our reputation, which would adversely impact our business."

125.    In the main Risk Factors section, the Offering Documents stated the following, in relevant part:

> ***Complex software, components and assemblies used in our products may contain undetected defects that are subsequently discovered at any point in the life of the product. For example, in 2018, we recalled one batch of our XP8 devices from two wireless carriers due to manufacturing defects. Defects in our products may result in a loss of sales, delay in market acceptance and injury to our reputation and increased warranty costs.***
>
> ***Additionally, our software may contain undetected errors, defects or bugs. Although we have not suffered significant harm from any errors, defects or bugs to date, we may discover significant errors, defects, or bugs in the future that we may not be able to correct or correct in a timely manner.*** It is possible that errors, defects or bugs will be found in our existing or future software products and related services with the potential for delays in, or loss of market acceptance of, our products and services, diversion of our resources, injury to our reputation, increased service and warranty expenses, and payment of damages.

(Emphasis added.)

126.    The Risk Factors section of the Offering Documents further maintained that the Company conducted field testing of its products, stating in relevant part, "[w]hen the product is close to being a functioning model, we commence internal quality assurance processes and field

testing, which may include third-party lab testing, in-market field testing and interoperability testing."

127.    In the same Risk Factors section, the Offering Documents detailed risks pertaining to its products suffering technical issues or other failures, stating in relevant part:

> ***Our sales arrangements also generally include technical performance standards for our mobile phones and accessories sold, which vary by channel partner. If a technical issue with any of our covered products exceeds certain preset failure thresholds for the relevant performance standard or standards, the channel partner typically has the right to cease selling the product, cancel open purchase orders and levy certain monetary penalties. If our products suffer technical issues or failures following sales to our channel partners, we may be subject to significant monetary penalties and our channel partners may cease making purchase orders, which would significantly harm our business and results of operations.***

(Emphasis added.)

128.    The Risk Factors section also described the risks associated with failing to provide Sonim customers proper service, the Offering Documents stated the following, in relevant part:

> Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Sonim.  From time to time, we have granted credits to paid customers pursuant to the terms of these agreements.  We do not currently have any material liabilities accrued on our balance sheet for these commitments.  ***Any failure of or disruption to our infrastructure could make Sonim unavailable to organizations on Sonim.  If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Sonim, we may be contractually obligated to provide affected paid customers with service credits for future subscriptions***, or paid customers ***could*** elect to terminate and receive refunds for prepaid amounts related to unused subscriptions.  Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales.

(Emphasis added.)

***June 24, 2019 Form 10-Q***

129.    On June 24, 2019, after successfully completing its IPO, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Plaschke and Walker and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Plaschke and Walker attesting to the accuracy of the 1Q19 10-Q.

130.    Like the Offering Documents, the 1Q19 10-Q detailed some of the purported features of Sonim's phones and outlined the risks the Company *could* become subjected to if defects existed in its products. Specifically, the 1Q19 10-Q stated in relevant part:

> We are a leading U.S. provider of ultra-rugged mobile phones and accessories designed specifically for task workers physically engaged in their work environments, often in mission-critical roles. We currently sell our ruggedized mobile phones and accessories to three of the four largest wireless carriers in the United States—AT&T, Sprint and Verizon—as well as the three largest wireless carriers in Canada—Bell, Rogers and Telus Mobility. ***Our phones and accessories connect workers with voice, data and workflow applications in two end-markets: industrial enterprise and public sector.***

> *       *       *

> ***Defects in our products could reduce demand for our products and result in a loss of sales, delay in market acceptance and injury to our reputation, which would adversely impact our business.***

> Complex software, components and assemblies used in our products may contain undetected defects that are subsequently discovered at any point in the life of the product. For example, in 2018, we recalled one batch of our XP8 devices from two wireless carriers due to manufacturing defects. Defects in our products may result in a loss of sales, delay in market acceptance and injury to our reputation and increased warranty costs.

> Additionally, our software may contain undetected errors, defects or bugs. Although we have not suffered significant harm from any errors, defects or bugs to date, we may discover significant errors, defects, or bugs in the future that we may not be able to correct or correct in a timely manner. It is possible that errors, defects or bugs will be found in our existing or future software products and related services with the potential for delays in, or loss of market acceptance of, our products and services, diversion of our resources, injury to our reputation, increased service and warranty expenses, and payment of damages.

131.    The 1Q19 10-Q also maintained that the Company conducted field testing on its products and described Sonim's risk factors pertaining to potential technical issues with its products, stating in relevant part:

> When the product is close to being a functioning model, we commence internal quality assurance processes and field testing, which may include third-party lab testing, in-market field testing and interoperability testing.

* * *

> Our sales arrangements also generally include technical performance standards for our mobile phones and accessories sold, which vary by channel partner. If a technical issue with any of our covered products exceeds certain preset failure thresholds for the relevant performance standard or standards, the channel partner typically has the right to cease selling the product, cancel open purchase orders and levy certain monetary penalties. If our products suffer technical issues or failures following sales to our channel partners, we may be subject to significant monetary penalties and our channel partners may cease making purchase orders, which would significantly harm our business and results of operations.

132.    Lastly, the 1Q19 10-Q provided that, "[b]ased on the evaluation of our disclosure controls and procedures, our chief executive officer and chief financial officer concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective at the reasonable assurance level."

### *July 24, 2019 Press Release*

133.    On July 24, 2019, the Company issued a press release to discuss the Company's second quarter results for the fiscal quarter ended June 30, 2019. The press release projected expected net revenues to increase "between 25% and 30% compared to $135.7 million reported in fiscal 2018" for the fiscal year ending December 31, 2019. The press release further stated in relevant part:

> "Our success in the second quarter was driven by continued, effective sales execution, leading to the sustained operational momentum we've now realized over the last several quarters," said Bob Plaschke, CEO of Sonim Technologies. "More specifically, the 39% topline growth we generated in Q2 was propelled by the first full quarter of sales of our XP3 device, ***along with increasing demand for our existing models,***

*including the XP8 and XP5s. On a broader scale, our growth has been reinforced by several positive industry tailwinds and mandates, including FirstNet and the early stages of the transition from legacy land mobile radio (LMR) and push-to-talk (PTT) to smartphone and LTE networks. As the leading provider of next generation ultra-rugged mobile solutions, we are ideally positioned to further capitalize on these two market opportunities. We are encouraged by our first half results, and we expect to continue to deliver on the metrics that will drive long-term growth for our company*."

(Emphasis added.)

### *August 13, 2019 Form 10-Q*

134.    On August 13, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Plaschke and Walker and contained SOX certifications signed by Defendants Plaschke and Walker attesting to the accuracy of the 2Q19 10-Q.

135.    Like the Offering Documents and the 1Q19 10-Q, the 2Q19 10-Q detailed some of the purported features of Sonim's phones and outlined the risks the Company could become subjected to if defects existed in its products. Specifically, the 2Q19 10-Q stated in relevant part:

> We are a leading U.S. provider of ultra-rugged mobile phones and accessories designed specifically for task workers physically engaged in their work environments, often in mission-critical roles. We currently sell our ruggedized mobile phones and accessories to three of the four largest wireless carriers in the United States—AT&T, Sprint and Verizon—as well as the three largest wireless carriers in Canada—Bell, Rogers and Telus Mobility. *Our phones and accessories connect workers with voice, data and workflow applications in two end-markets: industrial enterprise and public sector.*
>
> * * *
>
> *Defects in our products could reduce demand for our products and result in a loss of sales, delay in market acceptance and injury to our reputation, which would adversely impact our business.*
>
> Complex software, components and assemblies used in our products may contain undetected defects that are subsequently discovered at any point in the life of the product. For example, in 2018, we recalled one batch of our XP8 devices from two wireless carriers due to manufacturing defects. Defects in our products may result in a loss of sales, delay in market acceptance and injury to our reputation and increased warranty costs.

Additionally, our software may contain undetected errors, defects or bugs. Although we have not suffered significant harm from any errors, defects or bugs to date, we may discover significant errors, defects, or bugs in the future that we may not be able to correct or correct in a timely manner. It is possible that errors, defects or bugs will be found in our existing or future software products and related services with the potential for delays in, or loss of market acceptance of, our products and services, diversion of our resources, injury to our reputation, increased service and warranty expenses, and payment of damages.

136.    The 2Q19 10-Q also maintained that the Company conducted field testing on its products and described Sonim's risk factors pertaining to potential technical issues with its products, stating in relevant part:

When the product is close to being a functioning model, we commence internal quality assurance processes and field testing, which may include third-party lab testing, in-market field testing and interoperability testing.

* * *

Our sales arrangements also generally include technical performance standards for our mobile phones and accessories sold, which vary by channel partner. If a technical issue with any of our covered products exceeds certain preset failure thresholds for the relevant performance standard or standards, the channel partner typically has the right to cease selling the product, cancel open purchase orders and levy certain monetary penalties. If our products suffer technical issues or failures following sales to our channel partners, we may be subject to significant monetary penalties and our channel partners may cease making purchase orders, which would significantly harm our business and results of operations.

137.    Lastly, the 2Q19 10-Q provided that, "[b]ased on the evaluation of our disclosure controls and procedures, our chief executive officer and chief financial officer concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective at the reasonable assurance level."

138.    The statements referenced above in ¶¶118-137 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) XP8's chipset was defective and experienced network connectivity issues traceable to Sonim's early adoption of Snapdragon; (2) customers who purchased and used XP8 lodged complaints with their carriers about the product's defects prior to the IPO; (3) XP8 was not the only phone with significant defects, Sonim's XP3 and XP5s were

not appropriately field tested to perform in real-life environments and experienced software deficiencies, including noise feedback when linked to accessories; (4) the defects in XP8, XP3, and XP5s were not corrected prior to the IPO and negatively affected the Company's XP8, XP3, and XP5s product sales; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading. The purported risk factors supposedly disclosed by the Company were inadequate as they were boilerplate and generalized at a time when the Individual Defendants were aware of concrete and ongoing issues with their primary products.

### The Truth About Sonim's Defective XP8 Chipset and Other Product Deficiencies Emerges

139.    Finally, on September 10, 2019, the Company issued a press release titled, "Sonim Technologies Provides a Corporate Updated," disclosing disappointing financial guidance revisions for the year ending December 31, 2019, the abrupt departure of its CFO, and details about defects in Sonim's mobile phones, among other things. The Company also filed a current report with the SEC on Form 8-K, disclosing the departure of Defendant Walker and the appointment of an interim replacement. The press release was attached as an exhibit to the Form 8-K. The press release revealed that the Company had been experiencing "technical challenges" with its mobile phones that negatively impacted its sales momentum. Specifically, the press release disclosed:

> Further, ***the company has experienced technical challenges related to its XP8 smartphone and other general non-systemic, accessory-related issues in its feature phones, which cumulatively resulted in lost sales momentum.*** These challenges have diverted resources away from launching smaller Tier 2 carrier customers and, as such, delayed the launch of Sonim devices to their customer base. The company believes that these issues are being remediated, and Sonim expects the bulk of the Tier 2 carriers to launch Sonim products in the latter part of 2019.

(Emphasis added.)

140.    The press release also revealed that the Company revised its fiscal guidance for the year ended December 31, 2019, reducing its anticipated net revenues from its previous expected "increase between 25% and 30% compared to $135.7 million reported in fiscal 2018[,]" to "flat or slightly below 2018 net revenue of $135.7 million reported in fiscal 2018[.]" Further, the revised fiscal outlook in the press release included "GAAP net loss, defined as net revenues less cost of goods sold, selling, general and administrative expenses, operating expenses, depreciation, interest, taxes and other expenses, is expected to be up to $15 million [and] [a]djusted EBITDA, a non-GAAP metric, is expected to be a loss of up to $5 million."

141.    That same day, the Company held a conference call to discuss its updated financial outlook disclosed in the press release. During the call, Defendant Plaschke confirmed that defects in Sonim's XP8, XP5s, and XP3 mobile phones caused "lost sales momentum in the second and third quarter[.]" As the second quarter began April 2019, Sonim began experiencing lost sales momentum due to the defects in its mobile phones *before* the IPO. Defendant Plaschke further confirmed on the call that:

> The carrier subsidies and sales plan deviated from our expectations and there were significant changes in the rollout of these efforts and as a result, resulted in a reduction of our expected net revenues for the second half of this year. ***Additionally, we did experience some software challenges related to our XP8 smartphone and some other general non-systemic accessory-related issues with our feature phones*.**

(Emphasis added.)

142.    Also during the call, Defendant Plaschke revealed that XP8's defects were tied to Sonim's early adoption of Snapdragon, and the "gamble" associated with deciding to be a "beta-customer" stating the following:

> On the XP8, we picked a chipset that explicitly because it supported band class 14. It was the first chipset available what's called a kind of mid-tier that Qualcomm provides that support band class 14, and so we in conjunction working with AT&T,

to get the products out. We picked the first available – the chipset that was most – earliest available to get band class 14 up and running.

*This chipset that Qualcomm when it releases chipsets, they don't really yet – don't really have a – and again I don't want to speak for Qualcomm, but the – you take a gamble on whether you're going to be the first chipset in a particular region of the world. It turns out that the chipset that we launched, we were the first to launch it in – at least from our – from what we understand, the first to launch at North America.*

*And when you do that, you unintentionally take – you unintentionally become the kind of the beta customer for that chipset and then you face a number of what I'd called network-related issues in terms of how the chipset works with the network configurations in the carriers in that particular region and they differ region to region.* So we – that has – that has been a unexpected kind of drag coefficient for us*. A number of corner cases emerged in terms of what would – how the phone operate in different parts of the country based off the different network configurations.* And we have finally *I think gotten over the hump in terms of getting that – those fixes made.* Those are software changes happily, so that they can be communicated over the air but it's taken us a number of maintenance releases and a number of – a lot of work with Qualcomm to kind of get there.

It's not a – so it's – you wouldn't – I don't know if you'd called it quality issue, just call it basically a new product introduction issue that we happen to be first. Typically, we try to, to your point or your question, we try not to be the first OEM to release a chipset in a particular region. *But because of the importance of getting band class 14 out, we unintentionally took that risk, so that's the XP8.*

(Emphasis added.)

143.    Defendant Plaschke further admitted that Sonim failed to adequately field test its XP5s and XP3 mobile devices, in order to prepare them for performing in mission critical environments, stating in relevant part:

*On the XP5s and the XP3, the phones are used in a number of scenarios that are not necessarily easy to test.* These are used in mission critical or what we called business critical scenarios where they are – they are put in combination with other accessories and put in unusual situations.

So, I'll give you an example. *You have a school bus company who has a certain wiring configuration to the little, the kind of a holder where you put the phone in, and that wiring configuration as it turns out if it's not -- if it's not, I don't*

> ***know what the right word is, if it's not optimized can created feedback that can affect the noise cancellation software on the phone***.
>
> ***These are as you might expect not easy things to debug before you launch and frankly we just – we kind of have to take on the chin to get these problems fixed***. The silver lining is that and there's multiple examples in this context of these what I would call very industrialized use cases, the silver lining is that once we figured this stuff out, we become the de facto answer for carriers to solve these tough industrial use cases where they're not going to put a normal consumer cell phone into that scenario.

(Emphasis added.)

144.    The underwriters of the Company's IPO negatively responded to these revelations. For instance, Oppenheimer & Co., Inc., issued a negative report on September 10, 2019, stating that:

> We won't defend the indefensible. What could go wrong for Sonim went wrong. A large new customer lowered sales forecasts, delayed subsidies, and has been slower than expected in stocking retail locations. Additionally, the company experienced technical challenges in both the XP8 smartphone and accessory related issues in its feature phones. Finally, working through these issues has slowed down rollouts to smaller carrier customers. Put together, sales momentum has slowed and guidance was significantly cut. More importantly, management has lost credibility and the stock has become a show-me stock.

145.    Lake Street Capital Markets, LLC lowered its pricing of the Company, reiterating that "the Company had software issues with some of its devices which diverted resources away from launching at Tier 2 carriers."

146.    National Securities Corporation, the last underwriter of the IPO, also dropped its pricing of Sonim from $17 to $9.

147.    On this news, the price of the Company's stock fell approximately 46.74%, or $3.30, tumbling from $7.06 per share at the close of trading on September 9, 2019 to $3.76 per share at the close of trading on September 10, 2019. On September 20, 2019, the first action in the State Securities Class Action was filed.

148.    The Company's stock price continued to dwindle over the following month, closing at $3.15 per share on October 7, 2019, the day the first action was filed against the Company in the Federal Securities Class Action.

149.    On October 30, 2019, a few weeks after the first action was initiated in the Federal Securities Class Action, the Company issued a press release and filed a current report with the SEC on Form 8-K announcing the termination and replacement of its CEO, Defendant Plaschke, with Defendant Wilkinson.

150.    Still, over a year after the truth emerged, the Company has yet to regain its business standing. The Company's stocks are currently trading at a meager $0.61 per share. Furthermore, the Company recently disclosed that the SEC has lodged a private investigation into Sonim, the subject matter of which remains unknown.

**The Individual Defendants Acted Knowingly or at Least Recklessly**

151.    The Individual Defendants made and/or allowed the dissemination of the aforementioned false and misleading statements and omissions despite having full awareness that Sonim's primary products were defective and not yet ready to perform as advertised before and after the IPO. However, these matters remained undisclosed despite their materiality to the Company's business operations.

152.    As expounded upon herein, the Individual Defendants were intimately aware of the significant risks associated with the XP8 chipset and the software issues its other phones had been experiencing due, in part, to their inadequate field testing. Indeed, in September 2019, Defendant Plaschke admitted that the Company took a "gamble" when it decided to act as a "beta customer" for Qualcomm's Snapdragon chipset.

153.    Nonetheless, the Individual Defendants heavily touted the XP8, XP5s, and XP3 prior to and after the IPO—despite their undisclosed deficiencies, and the Company's reputation—

and its stock price as reflected above, were severely damaged once the products were on the market and Defendants could no longer avoid the significant quality, software, and/or technical issues they experienced and the resulting impact those realities had on Sonim's growth prospects and financial performance.

### Core Operations

154.    Moreover, Sonim's phone products and its sales momentum involved core operations of the Company during the Relevant Period. Indeed, the Individual Defendants touted the unique features of its devices and related applications—most notably, their purported capacity to be used to successfully connect people almost anywhere in the world where there is cellular coverage. Sonim's primary products were vital in successfully completing the Company's IPO and attracting investors. Consequently, Sonim's key product deficiencies would have affected Sonim's core operations. The Company's mobile devices and its sales to channel partners were also core components of Sonim's business, and each served as a substantial source of revenue for the Company. The Individual Defendants, as officers, directors, and controllers of the Company, would have been—or should have been aware of the material impact the chipset and other deficiencies its XP8, XP5s, and/or XP3 devices were having on the Company. Yet, they neglected to disclose material information to the investing public during the Relevant Period, including after successfully completing the IPO, rendering their statements false and misleading when made.

155.    Indeed, as stated in the Company's annual report filed with the SEC on Form 10-K on March 27, 2020 for the fiscal year ended December 31, 2019:

> ***We rely on our channel partners to generate a substantial majority of our revenues. If these channel partners fail to perform or if we cannot enter into agreements with channel partners on favorable terms, our operating results could be significantly harmed.***
>
> A substantial majority of our revenues are generated through sales by our channel partners, which are primarily wireless carriers who sell our phones through their

sales channels. To the extent our channel partners are unsuccessful in selling or do not promote our products, or we are unable to obtain and retain a sufficient number of high-quality channel partners, our business and operating results could be significantly harmed.

We enter into master sales arrangements with the majority of our channel partners (including channel partners contributing over 90% of our total revenues for the years ended December 31, 2019 and 2018) under which our partners purchase our products for distribution on a purchase order basis.

156.    As these issues involved Sonim's core operations, Board knowledge of the product deficiencies, the misleading statements describing Sonim's primary products, and the actualized risks posed to Sonim's business and operations may be inferred.

**Discriminatory Misconduct**

157.    In addition to the aforementioned misconduct, the Individual Defendants engaged in and/or permitted the Discriminatory Misconduct. The Individual Defendants allowed multiple violations of Sonim's corporate governance policies to occur that injured the company. These violations included, but were not limited to, engaging in or allowing the Discriminatory Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct.

158.    Sonim's Board is among the few publicly traded companies in the United States without Black or other racially underrepresented individuals on its Board, or amongst the ranks of its executive management either.

159.    The Company's Board assumes accountability for confirming that Sonim follows federal and state laws that prohibit racial discrimination. While diversity is a strong indication of a lack of discrimination, a lack of diversity is a compelling signal that the Company does, in fact, discriminate. Here, not one member of the Company's five-person Board or six-person executive management team listed on its website is Black or otherwise racially diverse. Instead, the overwhelming majority are, in fact, Caucasian men.

54

160.    The Individual Defendants have known for a long time that Sonim has been violating federal and state laws regarding diversity and discrimination and yet the Individual Defendants have repeatedly refused to nominate, appoint, or hire a Black or other underrepresented minority individual to the Board or executive team.

### Social Justice Corporate Initiatives in 2020

161.    While the Individual Defendants have caused Sonim to adopt discriminatory policies and fail to keep up with the times, the rest of corporate America, including the tech industry,[6] has been publicly condemning racism as well as implementing social justice initiatives at a rapid pace to combat systemic racism in America and in response to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[7] For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) Google has pledged to increase the representations of Black and other underrepresented groups at senior employment levels 30% by 2025; (3) Apple has, for the past five years, increased its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, and has committed to "increase representation in leadership across the company[]"; (4) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (5) Adidas committed to filing 30% of new positions with Black or Latino workers; and (6) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-Caucasian board, advocated that his seat be filled by a Black individual, and further pledged to use future

---

[6]    https://www.cio.com/article/3570512/how-top-tech-companies-are-addressing-diversity-and-inclusion.html?page=2. Last visited December 7, 2020.
[7] https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. Last visited December 7, 2020.

gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

162.    In blatant contrast, Sonim has refused to offer any sort of showing of solidarity with the Black Lives Matter movement. Instead, the Company has remained noticeably on the sidelines amongst the slew of companies that have pledged to implement changes to increase diversity, particularly Black representation, in corporate America.

163.    In fact, on December 1, 2020, *Yahoo! Finance* published a news article titled "Nasdaq proposes board diversity requirement for listed companies"[8] reporting that the Nasdaq had filed a proposal on that same day with the SEC which would require all Nasdaq-listed companies to adopt new rules related to board diversity or potentially face delisting. The new rules would require companies to "have, or publicly explain why they do not have, at least two diverse directors..." According to the *Yahoo! Finance* article, "[t]he exchange operator said that over two dozen studies found an association between diverse boards and better financial performance and corporate governance." The Nasdaq's recent proposal only serves to emphasize the importance of diversity and antidiscrimination and highlight the significance of Sonim's lack of diversity on its board resulting from the Discriminatory Misconduct.

### *Lack of Term Limits as Cause for Concern and Method to Discriminate*

164.    According to a report by the Harvard Law School Forum on Corporate Governance, longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating

---

[8]https://finance.yahoo.com/news/nasdaq-proposes-board-diversity-requirement -142022129.html. Last visited December 7, 2020.

and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

165.    Thus, contrary to the Company's contention within its Corporate Governance Guidelines, losing longstanding directors does not outweigh the benefits of incorporating new ideas and viewpoints from individuals with diverse backgrounds on the Board.

### *August 24, 2020 Proxy Statement*

166.    On August 24, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Wilkinson, Hochschild, Howe, Johnson, Kneuer, Swenson, and Young, solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[9]

167.    The 2020 Proxy Statement was false and misleading because, despite noting that the Company maintains a "Code of Conduct, applicable to all of our employees, executive officers, and directors," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

168.    The 2020 Proxy Statement also called for shareholders to: (1) elect seven directors; (2) approve an amendment to the 2019 Equity Incentive Plan which would increase the aggregate number of shares of common stock authorized for issuance under the plan by 3 million shares (the "Equity Incentive Plan Proposal"); (3) approve an amendment to the Company's Certificate of Incorporation to effectuate a reverse stock split, with the final exchange ratio to be determined by the Board; and (4) ratify Moss Adams as the Company's independent auditor for fiscal year 2020.

169.    The 2020 Proxy Statement stated, in relevant part:

> ***the Nominating and Corporate Governance Committee considers diversity (including gender, racial and ethnic diversity), age, skills and such other factors as it deems appropriate, given the current needs of the Board and the Company, to maintain a balance of knowledge, experience and capability.***

(Emphasis added.)

170.    The statements contained in the 2020 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial diversity of applicants for Board seats or the number of racially diverse members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly "including diversity," in the board composition and selection process, the truth is that Sonim has no Black, Hispanic, or other underrepresented ethnic minority members on either its Board or its executive management team. Therefore, the unrevealed reality is that Sonim may try to incorporate Black or other culturally/racially diverse candidates in its director nominee pool, but it either has no actual intent to nominate Black, Hispanic, or other culturally/racially diverse candidates to its Board, or the Company endeavors to obstruct the nomination of Black, Hispanic, or other culturally/racially diverse candidates in the pool. Either way, it is evident that racial

diversity is not among the relevant factors that the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

171.     Moreover, the 2020 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and inhibit Black, Hispanic, and other racially diverse individuals from having adequate prospects to be nominated and elected to the Company's Board.

172.     The Individual Defendants' failure to embrace director term limits and to add new members, including Black, Hispanic, or other underrepresented individuals, to Sonim's Board reflects explicit or implicit racism at the Company, and is a de facto improper cause for failing to include Black, Hispanic, or other underrepresented individuals as members of the Company's Board.

173.     The 2020 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black, Hispanic, and other underrepresented individuals from discrimination in its Board nomination process and Sonim's appointment process to the Company's executive management team. Moreover, the 2020 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's stated policies regarding diversity and providing a workplace free of discrimination were being complied with.

174.     The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black or other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial

diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

175.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, elected seven directors, that is, seven Caucasians, who were allowing the illegal and discriminatory practices to continue, and zero Black, Hispanic, or other racially diverse individuals, to the Board, and approved the Equity Incentive Plan Proposal.

176.    Shortly after certain of the Individual Defendants solicited the 2020 Proxy Statement, on September 24, 2020, Defendants Hochschild and Johnson, the only members of the Nominating and Corporate Governance Committee at the time, simultaneously resigned without explanation, effective September 27, 2020. In connection with Defendant Hochschild's departure and "in recognition of his longstanding service and contributions to the Company" the remaining Board members approved the accelerated vesting of 52,000 shares of the shares granted to Defendant Hochschild by the Company on June 9, 2020 and 5,000 of the shares granted to him on November 13, 2019. Defendants Young and Swenson thereafter joined the Nominating and Corporate Governance Committee to replace Defendants Hochschild and Johnson and have continued to allow and/or engage in the Discriminatory Misconduct.

## DAMAGES TO SONIM

177.    As a direct and proximate result of the Individual Defendants' conduct, Sonim will lose and expend many millions of dollars.

178.    Such expenditures include, but are not limited to, legal fees and the $2,000,0000 settlement associated with the Federal Securities Class Action filed against, among others, the

Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

179.    Such expenditures also include, but are not limited to, legal fees associated with the State Securities Class Action filed against, among others, the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

180.    Such expenditures include, but are not limited to costs associated with the costs of defending potential investigations of the Discriminatory Misconduct, and for the Company's loss of profits caused by the Discriminatory Misconduct.

181.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to certain of the Individual Defendants who breached their fiduciary duties to the Company.

182.    As a direct and proximate result of the Individual Defendants' conduct, Sonim has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

183.    Plaintiff brings this action derivatively and for the benefit of Sonim to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sonim, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

184.     Sonim is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.     Plaintiff is, and has been at all relevant times, a shareholder of Sonim.  Plaintiff will adequately and fairly represent the interests of Sonim in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

186.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

187.     A pre-suit demand on the Board of Sonim is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following five individuals: Defendants Wilkinson, Howe, Kneuer, Swenson, and Young (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five directors who are on the Board at the time this complaint is filed.

188.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts relating to, *inter alia*, Sonim's product standing and capabilities, the actualized risks the Company was currently facing, and/or the Discriminatory Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

189.     Demand is also excused as to all of the Directors because the Discriminatory Misconduct was an unlawful business strategy that the Company engaged in and was not a valid

exercise of business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

190.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

191.    The Directors knew of the falsity of the misleading statements at the time they were made. Prior to the IPO, the Company received numerous complaints regarding its primary mobile device products and deficiencies related to them. Sonim's mobile devices and its ability to make sales to its channel partners were highly material to the Company's core operations. As noted above, the Company derived 90% of its revenues from its product sales arrangements with channel partners. Because Sonim's mobile devices were its primary products and it heavily relied on sales arrangements for those products to generate revenues, thus core operations, the Company would have been materially affected by significant deficiencies in, technical challenges with, or software issues in relation to its XP8, XP5s, and XP3 devices. These facts support an inference of scienter as to Sonim's Directors, charged with overseeing the Company's affairs. It is reasonable to infer that the Directors, as Board members of Sonim, all must have had knowledge of information pertaining to Sonim's core operations and the material events giving rise to these claims. Defendants Howe, Kneuer, Swenson, and Young all served on the Board leading up to the IPO and signed the Registration Statement. Thus, they each knew of the falsity of the statements and

misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions with respect to Sonim's key products.

192.    Demand is also excused as to the Directors because they were fully aware of the Discriminatory Misconduct throughout the Relevant Period. Nonetheless, the Directors knowingly permitted and/or caused the Discriminatory Misconduct and caused the Company to disseminate the false and misleading statements related thereto as described herein. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

193.    Additional reasons that demand on Defendant Wilkinson is futile follow. Defendant Wilkinson is the current CEO of Sonim and has served in such capacity and as a Company director since October 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Wilkinson with his principal occupation, and he has received and continues to receive handsome compensation, including $339,369 for the months of October 2019 through the fiscal year ended December 31, 2019. Because Wilkinson is Sonim's CEO, he is in a unique position to create actualized change to the Company's and the Board's diversity and inclusion.[10] Yet, as an officer and director, he conducted little, if any, oversight of the Discriminatory Misconduct, which Defendant Wilkinson engaged in and permitted, despite being aware of it. He further perpetuated the Company's engagement in the scheme to make false and misleading statements in relation thereto. The Company provides Wilkinson with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and

---

[10] https://corpgov.law.harvard.edu/2019/04/03/driving-diversity-and-inclusion-the-role-for-chairs-and-ceos/. Last visited December 8, 2020.

evaluating his continued employment with Sonim. Thus, demand upon Defendant Wilkinson is not independent or disinterested, and thus demand upon him is futile and, therefore, excused

194.    Additional reasons that demand on Defendant Howe is futile follow. Defendant Howe has served as a Company director since October 2017. He also serves as the Chairperson of the Audit Committee. Defendant Howe has received and continues to receive compensation for his role as a director as described herein. Because the subject of the misleading statements and omissions regarding Sonim's products pertained to material events going to the core operations of the Company and given his role as Chairperson of the Audit Committee, Defendant Howe must have been aware of the falsity of the statements and omissions alleged above regarding Sonim's growth prospects and financial performance, demand for Sonim's products, and Sonim's product capabilities, at the time they were made. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Howe engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Howe signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Howe is a defendant in the Securities Class Actions. For these reasons, Defendant Howe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.    Additional reasons that demand on Defendant Kneuer is futile follow. Defendant Kneuer has served as a Company director since March 2019 and has served as Chairman of the Board since March 2020. He also serves as a member of the Audit Committee and Compensation

Committee. Defendant Kneuer has received and continues to receive compensation for his role as a director as described herein. Because the subject of the misleading statements and omissions regarding Sonim's products pertained to material events going to the core operations of the Company and given his role as a member of the Audit Committee, Defendant Kneuer must have been aware of the falsity of the statements and omissions alleged above regarding Sonim's growth prospects and financial performance, demand for Sonim's products, and Sonim's product capabilities, at the time they were made.  As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Kneuer engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kneuer signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Kneuer is a defendant in the Securities Class Actions. For these reasons, Defendant Kneuer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Swenson is futile follow. Defendant Swenson has served as a Company director since March 2019. She also serves as a member of the Nominating and Corporate Governance and Audit Committees and as the Chairperson for the Compensation Committee. Defendant Swenson has received and continues to receive compensation for her role as a director as described herein.  Because the subject of the misleading statements and omissions regarding Sonim's products pertained to material events going to the core operations of the Company and given her role as a member of the Audit Committee,

Defendant Swenson must have been aware of the falsity of the statements and omissions alleged above regarding Sonim's growth prospects and financial performance, demand for Sonim's products, and Sonim's product capabilities, at the time they were made. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Swenson engaged in and permitted despite being aware of it), consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Swenson signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Swenson is a defendant in the Securities Class Actions. For these reasons, Defendant Swenson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Young is futile follow. Defendant Young has served as a Company director since October 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Because the subject of the misleading statements and omissions regarding Sonim's products pertained to material events going to the core operations of the Company and given his roles, Defendant Young must have been aware of the falsity of the statements and omissions alleged above regarding Sonim's growth prospects and financial performance, demand for Sonim's products, and Sonim's product capabilities, at the time they were made.  As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory

Misconduct (which Defendant Young engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Young signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Young is a defendant in the Securities Class Actions. For these reasons, Defendant Young breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on the Board is futile follow.

199.    The false statements detailed herein in the 2020 Proxy Statement and the failure to establish term limits allowed for the Directors to entrench themselves on the Board and to continue to engage in the Discriminatory Misconduct, which resulted in not only a breach of the Directors' duties to the shareholders, but also resulted in lost profits for the Company. Therefore, demand is excused as to the Directors.

200.    Defendants Howe, Kneuer, and Swenson (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, "(i) the Company's corporate accounting and financial reporting processes, (ii) the Company's systems of internal control over financial reporting and audits of financial statements, [and] (iii) the quality and integrity of the Company's consolidated financial statements and reports[.]"[11] The Audit Committee Defendants were also responsible for reviewing and discussing

---

[11]    Sonim Technologies, Inc. Charter of the Audit Committee of the Board of Directors, https://d1io3yog0oux5.cloudfront.net/_52dbedc5e4a50246ec4578906796ccef/sonimtech/db/289/1615/file/Charter+of+the+Audit+Committee.pdf. Last visited September 16, 2020.

with management the Company's disclosures in its periodic reports with the SEC and earnings press releases. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them. Further, as discussed above, given that the Audit Committee's knowledge may be inferred, the Audit Committee Defendants failed in their oversight duties, reflecting clear deficiencies in the Company's ability to adequately implement or oversee its internal controls. The fact that the Company put together the minimum number of Board-level committees for a publicly traded company fails to establish that the Company maintained an adequate level of internal controls, in light of the misconduct and oversight failures discussed herein. The Company's Nominating and Corporate Governance Committee also failed to appropriately discharge their duties and responsibilities.

201.    Defendants Young and Swenson (the "Nominating and Corporate Governance Committee Defendants") served as members of the Nominating and Corporate Governance Committee during the Relevant Period. Pursuant to the Company's Charter for the Nominating and Corporate Governance Committee, the Nominating and Corporate Governance Committee Defendants are responsible for, among other things, identifying individuals qualified to become members of the Board, selecting the director nominees, and developing a set of corporate governance principles for the Company. The Nominating and Corporate Governance Committee Defendants engaged or permitted the Company to engage in the Discriminatory Misconduct. Thus, the Nominating and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

202.    Defendants   Swenson,   Kneuer,   Young   (the   "Compensation   Committee Defendants") served as members of the Compensation Committee and regularly approved excessive compensation for the Individual Defendants, despite the Discriminatory Misconduct. The Compensation Committee Defendants engaged in the Discriminatory Misconduct and not only failed to take action to correct or prevent it but rewarded it. They failed to uphold their responsibilities with integrity and rewarded the Individual Defendants for the Discriminatory Misconduct. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

203.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendants Johnson and Swenson both served as directors at FirstNet between August 2014 and August 2018 prior to joining the Board in March 2019. Additionally, Defendants Young and Howe both serve as directors at Orion Energy Systems, Inc. Further, Defendant Young holds numerous executive positions with outside companies that may inhibit him from acting in the best interests of the Company, including as President of B. Riley, the Company's largest stockholder. B. Riley is party to certain transactions with the Company and has been involved in various agreements with Sonim years before the IPO. Indeed, according to the 2020 Proxy Statement, prior to April 2020, the Board recognized Defendant Young's lack of independence due to his affiliations with B. Riley. Defendant Young is also the CEO of B. Riley Principal Investments, LLC, Babcock & Wilcox Enterprises Inc., magicJack VocalTec Ltd., and United Online, Inc. Both United Online, Inc. and magicJack VocalTec Ltd. are wholly owned subsidiaries of B. Riley. Defendant Howe also serves as a director of Babcock & Wilcox Enterprises Inc. and previously served as a director of magicJack VocalTec

70

Ltd. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

204.    In violation of the Code of Conduct, the Charter for the Nominating and Corporate Governance Committee, and Sonim's Corporate Governance Guidelines, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Discriminatory Misconduct, make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.  In violation of Sonim's governance documents and principles, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.  Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

205.    Sonim has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sonim any part of the damages Sonim suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

206.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation

from their violations of duty pursuant to the Company's bylaws. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

207.    The acts complained of herein constitute violations of fiduciary duties owed by Sonim's officers and directors, and these acts are incapable of ratification.

208.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sonim. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Sonim, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

209.    If there is no directors' and officers' liability insurance, then the Directors will not cause Sonim to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

210.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Wilkinson, Hochschild, Howe, Johnson, Kneuer, Swenson, and Young for Violations of Section 14(a) of the Securities Exchange Act of 1934**

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

213.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

214.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

215.     Under the direction and watch of the Individual Defendants, the 2020 Proxy Statement failed to disclose that: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black or other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

216.     The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose the Discriminatory Misconduct and that the Company's share price was being artificially inflated by the false and misleading statements related to, *inter alia*, the Discriminatory Misconduct made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

217.     Moreover, the 2020 Proxy Statement was false and misleading when they discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or the tolerance of the Discriminatory Misconduct and the scheme to issue false and misleading statements and omissions of material fact relating to the Discriminatory Misconduct.

218.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, the ratification of the selection of Moss Adams, and the approval of the Equity Incentive Plan Proposal.

219.    The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the approval of the Equity Incentive Plan Proposal and the re-election of Defendants Wilkinson, Howe, Kneuer, Swenson, and Young, which led to their entrenchment on the Board, allowed them to continue breaching his fiduciary duties to Sonim, including through continuing the Discriminatory Misconduct, and the Company's loss of profits.

220.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

221.    Plaintiff on behalf of Sonim has no adequate remedy at law.

### SECOND CLAIM

**Against Defendants Plaschke, Walker, Hochschild, Howe, Johnson, Kneuer, Swenson, and Young for Breach of Fiduciary Duties**

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sonim's business and affairs.

224.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

225.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sonim.

226.    In breach of their fiduciary duties owed to Sonim, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) XP8's chipset was defective and experienced network connectivity issues traceable to Sonim's early adoption of Snapdragon; (2) customers who purchased and used XP8 lodged complaints with their carriers about the product's defects prior to the IPO; (3) XP8 was not the only phone with significant defects, Sonim's XP3 and XP5s were not appropriately field tested to perform in real-life environments and experienced software deficiencies, including noise feedback when linked to accessories; (4) the defects in XP8, XP3, and XP5s were not corrected prior to the IPO and negatively affected the Company's XP8, XP3, and XP5s product sales; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

227.    The Individual Defendants further failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact.

228.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

229.    In breach of their fiduciary duties, one of the Individual Defendants engaged in improper insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact.

230.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sonim's securities.

231.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sonim's securities.

232.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

233.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sonim has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234.    Plaintiff on behalf of Sonim has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties
Related to the Discriminatory Misconduct**

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sonim's business and affairs.

237.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

238.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sonim.

239.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Discriminatory Misconduct.

240.    In breach of their fiduciary duties owed to Sonim, certain of the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the Discriminatory Misconduct.

241.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

242.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

243.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements relating to the Discriminatory Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sonim's securities, and disguising insider transactions.

244.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of engaging in and concealing the Discriminatory Misconduct and thereby artificially inflating the price of Sonim's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

245.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

246.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sonim has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

247.    Plaintiff on behalf of Sonim has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

248.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sonim.

250.     The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or similar compensation from Sonim that was tied to the performance or artificially inflated valuation of Sonim, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

251.     Plaintiff, as a shareholder and a representative of Sonim, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

252.     Plaintiff on behalf of Sonim has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

253.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sonim, for which they are legally responsible.

255.     As a direct and proximate result of the Individual Defendants' abuse of control, Sonim has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Sonim has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

256.    Plaintiff on behalf of Sonim has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

257.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sonim in a manner consistent with the operations of a publicly-held corporation.

259.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sonim has sustained and will continue to sustain significant damages.

260.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

261.    Plaintiff on behalf of Sonim has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

262.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sonim to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions and to lose financing from investors and business from future customers who no longer trust the Company and its products.

264.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

265.    Plaintiff on behalf of Sonim has no adequate remedy at law.

## EIGHTH CLAIM

**Against the Defendants Plaschke, Walker, Hochschild, Howe, Johnson, Kneuer, Swenson, and Young for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Sonim shareholders in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

268.    Federal law provides Sonim with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

269.    The plaintiffs in the Securities Class Actions allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

270.    Sonim is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

271.    As issuer of the shares, Sonim is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Actions.

272.    The plaintiffs in the Securities Class Actions allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for

the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

273.    The Individual Defendants, because of their positions of control and authority as officers and directors of Sonim, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sonim, including the wrongful acts complained of herein and in the Securities Class Actions.

274.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

275.    As such, Sonim is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Sonim, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Sonim;

(c)    Determining and awarding to Sonim the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Sonim and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable

laws and to protect Sonim and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Sonim to nominate at least three candidates for election to the Board, which should include at least two Black and/or Hispanic individuals;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

4.  a proposal to ensure the publication of an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Sonim;

5.  a proposal to establish a fund to hire Black individuals and other minorities, promote Black and Hispanic individuals and other minorities to more management positions at the Company, establish and maintain a mentorship program at Sonim for Black and Hispanic individuals and other underrepresented minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

6.  a proposal to establish and require annual training of Sonim's entire Board and all executive officers, which training should at a minimum focus on diversity,

antidiscrimination, and affirmative action, as well as other relevant topics; and

       7.  a proposal to adopt a revised executive compensation program that ties 30%

of executives' compensation to the achievement of certain specified diversity goals.

      (e)     Awarding Sonim restitution from the Individual Defendants, and each of

them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and

proper.

Dated: February 1, 2021                Respectfully submitted,

                                         **FARNAN LLP**

                                       /s/ Michael J. Farnan
                                       Brian E. Farnan (Bar No. 4089)
                                       Michael J. Farnan (Bar No. 5165)
                                       919 N. Market St., 12th Floor
                                       Wilmington, DE 19801
                                       Telephone: (302) 777-0300
                                       Facsimile: (302) 777-0301
                                       Email: bfarnan@farnanlaw.com
                                              mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net